

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-386-CV

IN THE INTEREST OF Z.D., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Tamica D. appeals from the trial court's order terminating the parent-child relationship between her and her daughter, Z.D. In four issues, Tamica contends that (1, 2) the evidence is legally and factually insufficient to prove that she had her parental rights terminated as to another child and that she voluntarily, deliberately, or consciously engaged in conduct that endangered Z.D., (3) the evidence is factually insufficient to support the trial court's best

---

[1] See Tex. R. App. P. 47.4.

interest finding, and (4) she received ineffective assistance of counsel.  We affirm.

## Factual Background

Z.D. was born on December 11, 2006.  On December 13, 2006, the Department of Family and Protective Services ("Department") took Z.D. into custody because of the risk of neglectful supervision.  The Department stated that it had reason to believe that Z.D. was at risk "based on [Tamica's] history and lack of current stability."  On December 14, 2006, the Department filed its petition to terminate Tamica's parental rights with regard to Z.D.

Tamica has four older children, C.D., B.D., A.W., and C.W., to whom she has given up custody, although her parental rights to the children have never been terminated.  Tamica gave C.D., who was born on March 20, 1996, up for adoption to his godparents after she was sent to prison for the offense of manufacture and delivery of a controlled substance.  She then gave B.D., who was born on August 6, 2000, to the Flynns, her mother and step-father, because she was heavily involved in drugs and could not adequately care for her.  In regards to A.W. and C.W., born on February 7, 2003, and January 20, 2004, respectively, the Department removed them after allegations of medical neglect regarding A.W.  At the time of trial, A.W. and C.W. were living with paternal relatives in Michigan.

2

Tamica acknowledged that she has had a drug problem since 1996 when C.D. was born. On December 27, 2006, a hair-follicle test to which Tamica submitted came back positive for cocaine. Additionally, in July 2007, Tamica tested positive for cocaine and ecstasy. Tamica denied using cocaine and explained that it was in her system because ecstasy is cocaine based.

As part of her service plan, Tamica was required to attend drug assessment and treatment. However, Tamica did not check into Pine Street, a drug treatment facility, until July 2007, which was after she tested positive for cocaine and ecstasy. At the time of trial, Tamica had completed ten days in detox and thirty-eight days at a drug treatment program and was 120 days clean.

Tamica stated that she completed all of the requirements of her service plan except for the psychological testing because she did not have a copy of the service plan. Tamica acknowledged that she received a copy of the service plan on February 23, 2007. However, she stated that she received a second copy of the service plan at the end of March because Jennifer Graves, her then Department caseworker, told her that her supervisor had not signed the copy that had originally been sent. Tamica stated that after she was sent to jail for assaulting her step-father, Mr. Flynn, she lost her apartment and everything was thrown away, including her copy of the service plan. Tamica stated that

3

she received a third copy of the service plan in June, after Pam Gillinger had taken over as her caseworker.

Tamica testified that after she got out of jail, she went to work as an exotic dancer at the T&A Club and then at Illusions. She stated that neither job gave her pay stubs to submit to the Department because although she receives W2 forms at the end of the year, she gets paid in cash during the year.

Tamica stated that after Z.D. was born, she was allowed weekly visits with Z.D. However, Tamica acknowledged that she only visited Z.D. once in January and once in February. Tamica testified that she did not get to visit with Z.D. as often as she was supposed to because "half the time" the Flynns, who had custody of Z.D., or the Department would not show up for the scheduled visitation. Tamica said there were occasions that she could not make the visitation, but that she always called the Department or the Flynns to let them know that she was not going to be able to make the visitation. She also stated that there were "several times" that she cut the visitation short because Z.D. was not feeling well.

Further, Tamica changed residences frequently between Z.D.'s birth and the termination trial. Tamica was living at the Union Gospel Mission, a homeless shelter in Fort Worth, when Z.D. was born. In mid-January 2007, after being asked to leave Union Gospel Mission because she was in the family

4

center and she did not have custody of Z.D., Tamica went to a women's shelter.  In February 2007, Tamica moved into a duplex.  Then in March 2007, Tamica moved into an efficiency apartment.  Later that month, Tamica went to jail for an assault that occurred in 2005 against Mr. Flynn.  When she got out of jail in late March, Tamica moved in with an unnamed friend.  Tamica then moved into a Days Inn motel and then moved to a Motel 6.  Finally, from mid-July 2007 to the time of trial, Tamica was living at Pine Street.

At trial, Tamica testified that she had been using drugs since 1996.  She admitted that she would disappear and not contact the Flynns, who were caring for her daughter, B.D., for long periods of time.  Tamica stated that she has been diagnosed with bipolar disorder and manic depression.  She further stated that she had not been taking her bipolar-disorder medication consistently over the years, but that she began taking it on a regular basis in August 2007.

Graves, the Department caseworker who handled Z.D.'s case from December 2006 until June 2007, testified that she first met Tamica in December 2006 during the first show cause hearing.  Graves stated that in the first five months after Z.D. was removed, Tamica only saw Z.D. five times.  Graves did state, however, that there was one visit that had to be cut short because B.D. was sick at school and needed to be picked up, another visit that was cancelled by Mrs. Flynn because there was a miscommunication about the

5

time, and a third visit that was cancelled because there was a miscommunication on the part of the Department. Graves testified that Tamica had a two-hour visit with Z.D. on January 11, 2007, and that she did not have any visits with Z.D. in February.

Graves said that during the time that she was Z.D.'s caseworker, Tamica did not attend any parenting courses; did not complete a drug assessment, psychological assessment, or individual therapy; did not establish safe, stable, and appropriate housing; and did not provide evidence of a stable job, all of which were required under the service plan.

Gillinger, the Department caseworker who handled Z.D.'s case from June 2007 until the time of trial, testified that she first made contact with Tamica in early July. She stated that Tamica told her that she had not received a service plan and so she brought Tamica a copy on August 8.

Gillinger stated that the first report the Department received regarding Tamica was on June 21, 1996, involving C.D. She stated that the allegation was neglectful supervision. She also stated that there was a referral on February 14, 2001, of physical neglect regarding B.D. Gillinger stated that it was determined that Tamica was leaving B.D. in unstable environments, neglecting parenting for days, weeks, and even months at a time, and leaving

6

B.D. with people that she did not know. Additionally, on March 27, 2003, the Department received a referral of medical neglect regarding A.W.

Gillinger testified that in July 2007, after Tamica tested positive for cocaine and ecstasy, Tamica was concerned that her probation[2] was going to be revoked. She stated that Tamica entered drug treatment a week or two after the positive drug test. Additionally, Gillinger stated that Tamica does seem to care for Z.D. and love her. She also stated that the Flynns love and have bonded with Z.D.

Mr. Flynn testified that Z.D. was officially placed with him and his wife on December 29, 2006. Mr. Flynn stated that while caring for Z.D., he has been disappointed with the Department's failure to return phone calls. He said that when Z.D. had to go to the hospital while she was in their care, he had to contact the attorney ad litem because the Department caseworker was out of town. He also said that he has not been well informed of the court hearings.

Mr. Flynn stated that he has a "fairly good relationship" with Tamica except when she does not take her medication. He said that Tamica can be a "very violent person when she [is] not taking her medication." He stated that he has known Tamica since she was eighteen years old and "got out of prison."

---

[2] Tamica was on probation for assault.

Mr. Flynn said that he considers Tamica to be his daughter. Mr. Flynn testified, however, that Tamica does not have a relationship with her mother.

Mr. Flynn further stated that he considers Z.D. to be part of the family. He stated that Z.D. calls him "Da-da" and that she calls B.D. "Sissy." Mr. Flynn also stated that Z.D. is attached to Mrs. Flynn. Mr. Flynn testified that when Z.D. first came to their home, she was underweight and "frail."

Additionally, Mr. Flynn testified that when B.D. was born, Tamica was having drug and mental problems. He stated that in the few months after B.D. was born, he and his wife were caring for B.D. because Tamica would leave the house and be gone for two or three days at a time. He stated that on one occasion, Tamica took B.D. and walked to a bus stop when it was fifty-five degrees outside and raining. He said that B.D. was only wearing pajamas and was wrapped in a blanket and that Tamica did not have an umbrella. He stated that five or six weeks later he and his wife obtained custody of B.D.

He further stated that Z.D. would possibly be safe in Tamica's care while she was in the program, but that when she is discharged from the program he "would [not] be able to sleep nights." Mr. Flynn explained that all of Tamica's boyfriends have assaulted her and that if they do that to someone they supposedly love, he would be concerned with what would happen when Z.D. started crying in the middle of the night.

8

Mr. Flynn testified that he believed it would be in Z.D.'s best interest to terminate Tamica's parental rights. He stated that Tamica does not have stability in her life. Mr. Flynn further said that when Tamica was living two homes down from him and his wife while they had custody of B.D., Tamica never came down to visit with B.D. He also stated that Tamica has never sent letters, Christmas cards, or birthday cards to B.D. nor gone to any school functions for B.D.

Finally, Mr. Flynn stated that he had a discussion with Tamica regarding why she went to Pine Street. He stated that Tamica told him that she had failed a drug test and was afraid that her probation was going to be revoked and she would go to jail. Tamica also told Mr. Flynn that she needed to have custody of Z.D. to remain in the program.

**Procedural History**

The Department filed its petition for termination on December 14, 2006. As grounds for termination, the Department alleged that Tamica (1) knowingly placed or allowed Z.D. to remain in conditions that endangered the physical or emotional well-being of Z.D.; (2) knowingly placed Z.D. with persons who engaged in conduct which endangers the physical or emotional well-being of Z.D.; (3) executed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by chapter 161, Texas Family Code; (4)

9

constructively abandoned Z.D. while she was in the Department's conservatorship; (5) knowingly engaged in criminal conduct that resulted in Tamica's conviction; and (6) had her parent-child relationship terminated with respect to another child.

After a bench trial, the trial court found that Tamica knowingly placed or knowingly allowed Z.D. to remain in conditions or surroundings which endangered the physical or emotional well-being of Z.D., engaged in conduct or knowingly placed Z.D. with persons who engaged in conduct which endangered the physical or emotional well-being of Z.D., and had her parent-child relationship terminated with respect to another child based on a finding that Tamica's conduct violationed section 161.001(1)(D) or (E) of the Texas Family Code or a substantially equivalent provision of another state. The trial court further found that termination was in Z.D.'s best interest. The trial court terminated Tamica's parental rights and appointed the Department as Z.D.'s permanent managing conservator. Tamica filed a motion for new trial, which the trial court denied after a hearing.

**Discussion**

In her first, second, and third issues, Tamica argues that the evidence is legally and factually insufficient to support the trial court's judgment under section 161.001(1)(D), (E), and (M) of the family code and that the evidence

10

is factually insufficient to support the trial court's best interest finding. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M), (2) (Vernon 2007).

## A. Legal and Factual Sufficiency

### a. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26. In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

11

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our

13

own.  *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(D), (E), and (M) and that the termination of the parent's parental rights would be in the best interest of the child.  *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.  If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding.  *J.F.C.*, 96 S.W.3d at 266–67.

### b.  Endangerment

Under section 161.001(1)(D), the environment of a child must be examined to determine if it is a source of endangerment to the child.  *Id.* § 161.001(1)(D); *In re D.T.*, 34 S.W.3d 625, 632 (Tex App.—Fort Worth 2000, pet. denied).  Under section 161.001(1)(E), the term "endanger" means to expose to loss or injury, to jeopardize.  *Boyd*, 727 S.W.2d at 533.  Accordingly, when analyzing the trial court's findings under subsection (E), we must determine whether sufficient evidence exists that the endangerment of

14

the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.M.*, 58 S.W.3d 801, 811–12 (Tex. App.—Fort Worth 2001, no pet.). Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id.*

To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *D.M.*, 58 S.W.3d at 812. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

A pattern of continued drug use, including drug use during the pregnancy of another child and a parent's failure to remain drug-free while under the Department's supervision, will support a finding of endangering conduct under section 161.001(1)(D) even if there is no direct evidence that the parent's drug

use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding evidence legally and factually sufficient to support endangering-conduct finding when older sibling of subject child tested positive for drugs at birth and parent continued to use drugs after subject child's birth and during pendency of Department's involvement). A fact-finder may reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet).

Here, Tamica admitted that she used illegal drugs before Z.D. was born and that she continued to use them until approximately August 13, 2007. Tamica stated that she gave up custody of one of her children, B.D., because she was using drugs and did not complete drug treatment. Further, Tamica tested positive for cocaine in December 2006, shortly after Z.D. was born, and cocaine and ecstasy in July 2007.

16

On the other hand, there is no direct evidence that Tamica was using drugs while she was pregnant with Z.D. The record also shows that Tamica began drug treatment in July 2007. At the time of trial, she had completed ten days in detox and thirty-eight days in a drug treatment program.

In addition to the evidence concerning Tamica's drug use, the record shows that Tamica changed residences frequently without telling the Department where she was, did not gain stable employment, and went to prison for assault.

We hold that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(E). Because a finding of a violation of single paragraph of a section 161.001(1)—coupled with a finding that termination is in the child's best interest— will support a termination order, we need not consider Tamica's argument that the evidence is legally and factually insufficient to support the trial court's finding under sections 161.001(1)(D) and (M). *See* Tex. Fam. Code Ann. § 161.001; Tex. R. App. P. 47.1. We overrule Tamica's first and second issues.

### c. Z.D.'s Best Interest

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with

17

a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)    the desires of the child;

(2)    the emotional and physical needs of the child now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individuals seeking custody;

(5)    the programs available to assist these individuals to promote the best interest of the child;

(6)    the plans for the child by these individuals or by the agency seeking custody;

(7)    the stability of the home or proposed placement;

(8)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that

18

termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**(1) Z.D.'s desires.**

Because Z.D. was less than a year old at the time of trial, our review of the record finds no significant evidence related to this factor.

**(2) Z.D.'s emotional and physical needs now and in the future.**

Mr. Flynn testified that Z.D. has a "little bit of a learning disability." He said that Z.D. is a "little delayed on her motor skills, crawling and everything." However, Mr. Flynn stated that Z.D. is in a program that has someone come to the house once a week for two hours and work with Z.D. regarding her problems.

Both Graves and Gillinger stated that they did not believe that Tamica would be able to adequately provide for the emotional, physical, mental, and spiritual needs of Z.D. now or in the future. Gillinger pointed to Tamica's history of instability, lack of steady employment, different housing, and long history of drug use to support her belief. She further stated that although Tamica could provide for Z.D.'s physical, emotional, mental, and spiritual needs while she was at First Choice, she was unsure whether Tamica would be able to adequately provide for Z.D. when they left the program. She was also

19

concerned that Tamica would return to using drugs when she left the program. She further pointed to Tamica's lack of employment skills to suggest that she would return to her prior lifestyle.

### (3) The emotional and physical danger to Z.D. now and in the future.

Both Graves and Gillinger testified that they believed that Tamica's history of drug use and past Department history suggest that similar issues would pose an emotional and physical danger to Z.D. now and in the future. *See In re C.A.J.*, 122 S.W.3d 888, 893–94 (Tex. App.—Fort Worth 2003, no pet.) (noting that a parent's continuous drug use poses an emotional and physical danger to a child now and in the future).  On the other hand, Tamica has completed parenting classes, life-skills courses, and anger management classes.  Tamica has made late progress in putting her drug use and prior lifestyle behind her.

### (4) The parental abilities of the person seeking custody.

Tamica has not exhibited exemplary or even passable parenting abilities in the past.  She has four other children but has raised none of them.  Tamica testified that she gave C.D. up for adoption to his godparents because she went to prison for the offense of manufacture and delivery of a controlled substance. Additionally, she stated that she decided that it was better for B.D. to live with

20

the Flynns because she was heavily involved in drugs. Tamica further stated that the Department removed A.W. and C.W. from her care and placed them with relatives in Michigan.

Further, Tamica has shown a lack of interest in visiting Z.D. Graves testified that Tamica only visited Z.D. five times during the first five months after Z.D. was removed. On the other hand, as stated above, Tamica has completed life-skills courses, parenting classes, and anger management classes. Tamica testified that she is currently taking a class to help her interact with Z.D. Additionally, Tamica has decorated a room at First Choice for Z.D. when Z.D. comes to visit her.

The history of drug use, domestic instability, and unemployment support a finding that reunification would not be in Z.D.'s best interest. By contrast, the Flynns, who have been caring for Z.D., have been raising one of Tamica's other children for seven years.

**(5) Programs available to assist those seeking custody.**

Our review of the record finds no significant evidence related to this factor.

**(6), (7) The plans for Z.D. of those seeking custody and the stability of the home or proposed placement.**

Mr. Flynn testified that he and his wife would like to be named sole managing conservator of Z.D. Additionally, Graves recommended that Tamica's parental rights be terminated and that Z.D. be placed with the Flynns. She stated that the Flynns' home provides stability for Z.D. and that it is the only home that Z.D. has known. She also stated that the Flynns and Z.D. have formed a strong bond and that the Flynns treat Z.D. like their own child. Graves stated that the Flynns provide a safe and stable environment for Z.D. Additionally, Gillinger stated that the Flynns have been able to provide Z.D. with "structure and stability . . . in a loving environment."

**(8) Acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one.**

We have already detailed the evidence that may indicate that the existing parent-child relationship between Tamica and Z.D. is not a proper one. The evidence includes Tamica's drug use and domestic instability. More than any other evidence, this evidence weighs heavily in favor of a finding that termination is in Z.D.'s best interest. However, there was evidence presented during the trial that showed that Tamica has made significant, albeit belated, changes and improvements in her life.

22

**(9) Any excuse for the acts or omissions of the parent.**

The record does not reflect any excuses for Tamica's acts or omissons.

Considering all of the evidence relevant to the *Holley* factors, including the evidence that contradicts the trial court's best interest finding, we hold that a fact-finder could rationally have formed a firm belief or conviction that termination of Tamica's parental rights as to Z.D. is in Z.D.'s best interest. Accordingly, we hold that the evidence is factually sufficient to support the trial court's best-interest finding. Thus, we overrule Tamica's third issue.

**B.  Ineffective Assistance of Counsel**

In her fourth issue, Tamica complains that she was denied the effective assistance of counsel after Z.D.'s removal and at trial. Specifically, Tamica contends that her attorney (1) failed to challenge Z.D.'s removal based on a defective affidavit, (2) allowed a witness to remain in the courtroom after the Rule had been invoked, (3) failed to impeach a defense witness after his damaging testimony, and (4) failed to object to the admission of hearsay evidence regarding the hair follicle testing.

**a.  Standard of Review**

There is a right to effective assistance of counsel in termination cases. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence

that her counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *see also In re S.L.*, 188 S.W.3d 388, 395 (Tex. App.—Dallas 2006, no pet.).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63. A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind

24

trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

### b. Analysis

Tamica first complains that her attorney was ineffective because he did not challenge the removal of Z.D. based on a defective affidavit. Tamica argues

25

that the affidavit prepared by Andrea Jennings, a Department specialist, was not based on personal knowledge as required under the section 262.104 of the family code. *See* Tex. Fam. Code Ann. § 262.104 (Vernon Supp. 2008).

Tamica argues that her attorney should have objected to the affidavit because it was not based on personal knowledge but, instead, simply "rehashed" allegations of the Department's history of Tamica. However, there is no evidence in the record to establish why Tamica's counsel did not object to the alleged defective affidavit. Where the record is silent, it is impermissible for us to speculate that trial counsel's performance was deficient. *See Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000) (holding that "without some explanation as to why counsel acted as he did, we presume that his actions were the product of an overall strategic design"), *cert. denied*, 532 U.S. 1053 (2001); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Instead, we presume that trial counsel acted out of sound trial strategy. *Tong*, 25 S.W.3d at 714. Thus, Tamica has failed to establish that her counsel's actions were deficient. Additionally, Tamica has failed to prove prejudice, a requisite under *Strickland*. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. We hold that Tamica has not proven that her attorney was ineffective because she has not shown that her attorney was deficient or that she was prejudiced by her attorney's alleged deficient performance.

26

Tamica also contends that her attorney was ineffective because he allowed Mr. Flynn to remain in the courtroom after the Rule had been invoked. *See* Tex. R. Evid. 614. Rule 614 of the Texas Rules of Evidence provides in relevant part that "[a]t the request of either party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." *Id.* The policy behind the Rule is to minimize "witnesses' tailoring their testimony in response to that of other witnesses and prevent[ing] collusion among witnesses testifying for the same side." *In re K.M.B.*, 91 S.W.3d 18, 28 (Tex. App.—Fort Worth 2002, no pet.) (citing *Drilex Sys., Inc. v. Flores*, 1 S.W.3d 112, 116 (Tex.1999)).

After the Rule had been invoked, the prosecutor stated that, "[Mr. Flynn] is one of the custodians of the child at this time. We would ask that he be allowed to remain in the courtroom." The trial court then asked if there were any objections to Mr. Flynn being allowed to remain in the courtroom, and Tamica's attorney stated that he did not object.

Tamica cannot show that her attorney was deficient. Tamica makes conclusory statements that her attorney did not adequately review the Flynns' home study. However, there is no evidence in the record explaining trial counsel's reasons for allowing Mr. Flynn to remain in the courtroom. Again, when the record is silent as to counsel's reasons, we presume that trial counsel

27

acted out of sound trial strategy. *Tong*, 25 S.W.3d at 714. Thus, Tamica has failed to show how her attorney was deficient.

Additionally, Tamica has failed to establish prejudice. Tamica simply states that Mr. Flynn's testimony should have been elicited at the December 29, 2006 show cause hearing, but fails to allege how the outcome of the trial would have been different if her attorney had required Mr. Flynn to remain outside the courtroom during Graves's and Gillinger's testimony. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Thus, Tamica cannot satisfy the *Strickland* test because she cannot show how her attorney was deficient or how she was prejudiced by her attorney's alleged deficient conduct.

Tamica next argues that her attorney was ineffective because he did not impeach Mr. Flynn after his damaging testimony. Once again, there is no evidence in the record regarding trial counsel's reasons for not impeaching Mr. Flynn. As stated above, because the record is silent as to trial counsel's reasons, we presume that trial counsel acted out of sound trial strategy. *See Tong*, 25 S.W.3d at 714. Further, Tamica has failed to show how the outcome of the trial would have been different but for her attorney's alleged deficient performance. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Thus, Tamica has not satisfied either prong of the *Strickland* test.

28

Finally, Tamica argues that her attorney was ineffective because he did not object to the admission of hearsay evidence regarding the hair-follicle tests. Specifically, she complains that her trial attorney has a "deficient understanding of the Rules of Evidence." At trial, evidence of the hair-follicle tests were introduced during Gillinger's testimony. However, there is no evidence in the record as to why Tamica's attorney did not object to the admission of the hair-follicle tests, so we must presume that it was the result of sound trial strategy. *See Tong*, 25 S.W.3d at 714. Additionally, before the results of the tests were introduced at trial, Tamica testified that she had tested positive for cocaine and ecstasy in July 2007. As such, Tamica cannot show that her attorney was deficient. Furthermore, Tamica has failed to allege how the outcome of the trial would have been different if her attorney had objected, a requisite of the *Strickland* test. Thus, Tamica cannot show that her attorney was ineffective. Because Tamica has failed to satisfy the *Strickland* test for any of her ineffective assistance claims, we overrule her fourth issue.

**Conclusion**

Having overruled Tamica's four issues, we affirm the trial court's termination order.

ANNE GARDNER
JUSTICE

PANEL:    GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  September 25, 2008